If you'll bear with me, Your Honor, we're going to fix the focus on the Zoom. Okay. I apologize. No problem. Thank you, Your Honor, we're ready. I'm not quite. Okay. You let me know, Your Honor. I think I'm ready. Okay. Thanks, Bobby, or Judge Baldock. I'll call case number 21-3005, Sanofi-Aventis U.S. v. Mylan. Good morning, Your Honor. I'm Greg Silbert from Weill v. Sanofi. This case should go to a jury, and that jury could easily find that Mylan used its monopoly to raise EpiPen prices, harm consumers, and block competition from EpiPen's first and only real competitor. What I hope to do today is highlight for you three disputed fact issues, three out of many in our briefs, that the district court incorrectly decided in Mylan's favor but that must be submitted to a jury. Fact dispute number one, did Mylan have entrenched share? And what entrenched share means, very simply, is that these payers had to buy lots and lots of EpiPens, whether they wanted to or not, because EpiPen had 99% market share. EpiPen was the only game in town for years for a device used for life-threatening emergencies. EpiPen is the device that the babysitter knows how to use. EpiPen is the device in the grandparent's home. No matter what, even when a better mousetrap comes along, like Obby Q, there is no way that you will get every single person to move off of EpiPen right away. You're going to have to bear with me because I've got two or three questions that I really need to understand and answer in this case. It's an important case. I understand that. That's why I want to get a good handle on this. Is your argument requiring or relies on us to apply behavior economics as developed by Mr. Thayer and Travesky and Coleman, I believe his name? Can you point us to any case that went to the jury where the plaintiff relied on behavioral economics to develop their legal theory? Our argument does not depend in any way on behavioral economics, Your Honor. That's what I wanted to be sure that I understood, that you're saying you're not, you're brief and I'm not an expert by any means in this. And so that's why both counsel are going to have to help me a lot. I try not to ask a question unless I need a real answer in regards to it. So anyway, thank you for that answer. Yes, Your Honor. Back to the fact dispute. Does Mylan have entrenched share? Mylan's brief calls that a theory. It's not a theory. It's a fact. Mylan either had it or it didn't. And if Mylan had it, what it means is that the payers had to buy lots and lots of EpiPens no matter what. Now, the district court found, as a matter of fact, on page 113 of its decision that Mylan did not have entrenched share. The problem is there's a ton of evidence. Wait, wait, wait. Where are you going from there? Can you explain where the entrenched share comes from? Is that you use the term entrenched share these terms? You've got to help me out there. Can you explain to me what the entrenched share or where the entrenched share comes from? Yes, I can, Your Honor, and it's sort of an unfamiliar and maybe a technical sounding term. All it means, again, very simple. In the short term, these payers had to buy lots of EpiPens. No choice about it. They had to buy EpiPens. Where does it come from? Well, think about it. You have for years and years there is only one product, the EpiPen. They had 99% market share. This is a product that you only use when your life is in jeopardy. It's the only one that people are familiar with. Yes, Your Honor. Well, now, counsel, from what reading I've done, what you just explained, that is the behavioral economics theory. It's not a theory, Your Honor. It's just a fact about whether all of the patients would move off of EpiPen right away in a very short time. Fact or otherwise, that's what I'm saying. It is a behavioral economics. Well, I think it's… Fact or otherwise. However we describe it, it's a fact question. It's a fact question. That's what I'm saying. I've asked you earlier about what the behavioral economics are, and I need help. I mean, and you said no, but that is, from what I've read, an explanation of behavioral economics. I think, as I recall in the amicus briefs that's set out somewhere, I can't remember which one, but that to me is important in resolving where you're coming from. Your Honor, whatever terminology we use here, I don't want to lose sight of the fact that there's a fact question, that there's plenty of evidence that Mylon knew that… Yes, Your Honor. If there's a fact question, let's accept that there's a fact question. It has to be material, and I'd like for you to explain why, if there is an entrenched market share, why that's material to our evaluation, for instance, of whether there was substantial market foreclosure. Because Mylon, as a monopolist, can inflict a penalty on a payer that refuses to lock us out, and that means that Mylon is exercising monopoly power, something it can only do as a monopolist to exclude competition, something that it could not do in a competitive market, because in a competitive market, nobody has to buy EpiPens. Are you suggesting that that somehow, if there is what you're calling entrenched share that's not clearly defined, that there's some kind of per se liability then? I guess I'm not understanding from your briefing the significance of that, nor am I seeing you point to any case law which would accept any kind of per se liability in that situation. It's not per se liability, Your Honor. It's a fact question, and if there is entrenched share, then Mylon, as a monopolist, can inflict a penalty on the payers, and did inflict a penalty on the payers, if they refuse to exclude us. And as for a case that applies … How does that relate to, for instance, whether there was substantial market foreclosure here? Can you please relate it to that? Substantial market foreclosure is a slightly different question, but it does relate, and that goes to whether the exclusive contracts were actually short and easy to terminate. That's another fact question that the district court found. It relied on that fact to make its substantial foreclosure finding at page 105 of its decision. But in Z.F. Meritor, in Densply, and in McQuain, all of the contracts said that they could be terminated, and all of those courts of appeals found that, as a matter of fact, they could not actually be easily terminated because the monopolist could inflict a penalty on the dealer if it allowed competition. And that's exactly what happened here. And you want to see evidence of that? What short and easily terminable means, as all the cases say, and the district court found in this case, is the competitor can come along and win back the business by matching the monopolist's discount. What does the evidence show here? You have the largest payer, Express Scripts, says to us, you could give us a 100% discount, and it wouldn't be enough to get access. Think about that. 100% discount. You could give us the product for free, and we don't want it because the penalty that Mylan will inflict on us for allowing you access is more than the benefit you could provide, even if you gave the product away for nothing. Let's talk about the facts here. Wasn't it true? I think the statistic was 80% commercial access that Santa Fe was able to come back in 2015, and with discounts, and with playing the game, essentially, with prices, you were able to get an 80% market access, at least. Not share, but access. How does that fit into this whole idea of somehow, because of the entrenched market share, there couldn't be any, Santa Fe just couldn't enter the market, essentially? Thank you, Your Honor. Let's look at that closely. Almost the entirety of that reversal was one payer, Express Scripts, and the other payer, Aetna, was 1% of the market. So we're talking about one payer. What happened with that one payer when we reversed the exclusion? First, the payer came to us and said, you could give us 100% discount, and we don't want it. Let's not talk about the details. I guess what I'm talking about right now is effect, and aren't we supposed to be looking at what the effect of all of this was? Essentially, in 2015, you started turning things around. At that point, you end up with the recall, but weren't things going in a positive direction, and weren't you actually putting more investments towards this product in 2015? In 2015, we won back some, but not nearly enough of the access that we never could have been denied in the first place, and we didn't win it.  We did not win it by discounting or, as you said, playing the game because the payer said to us, discounting won't do it. Our own internal analysis, which you see at page 39 of our brief, this is internal contemporaneous analysis by Sanofi. Can we discount our way out? The answer is no because we would have to pay 151% discount in order to offset the penalty that Mylan is inflicting. So how did we get back access? We paid them $36 million to do it. That's something that almost no company could do. No company can be forced to do it. The point is in this product market, EAIs, there's no discount at all that would be enough to access the market. Now, yes, Sanofi had the resources to pay $36 million from another market, and, yes, when it did that, it won back access that never should have been denied at all with one payer, but even then, other payers, United told us, you would have to triple Mylan's discount even to start the conversation, and even then, we're not sure you would get coverage. In 2015, what's the evidence? Obviously pre-recall, what's the evidence that you were essentially giving up, that you weren't in this for the long term anymore? Were you cutting back on your investments? What was happening before the recall? No, Your Honor, we had been locked out, and we were trying to figure out a way to get access. That's the point of the chart on page 39. We said they locked us out. They're making payers pay a penalty if they give us access. Can we discount our way out? The answer you see on page 39, contemporaneous analysis, no, we cannot get there by discount. And when did you come up with that answer? When was that? It was in, I believe it was late 2013 as we were preparing for the 2014 negotiations that led to the 2015. But the point is we cannot get there by discounting. We had to pay. You talked about effects. Let's talk about effects on consumers. This is another fact question. Consumers, after all, are who the antitrust laws protect. The district court found at page 127 that consumers were not harmed. They clearly were harmed, Your Honor. They were denied access to a life-saving product, a product that teenagers would be more likely to have in their pockets when they went into anaphylactic shock and needed it to save their lives. I see I'm down to two minutes, and, Simon, with the court's permission, I'll reserve the balance of time for rebuttal. Thank you. Does anyone have questions before rebuttal? I've got one question in response to hearing what counsel said. Couldn't you have paid out of your own pocket? That's what we did do, Your Honor. But the point is normally you don't have to pay a buyer to take your product. If you have a better mousetrap and the buyer says to you, you can give that product to us for free, and we don't want it because the monopolist is going to inflict a bigger penalty on us for taking it. So if you pay us to take it, yes, we'll give you access. That's exactly what happened. That's how we reversed some of the exclusions in 2015. That is not competition on the merits of the product. As far as competition is concerned, you could have competed just by continuing in the market, because you weren't providing it below cost. And as I understand from my reading, neither was your opposition. In other words, this is all above cost. It doesn't fall into the situation of per se monopoly because everything is above cost. If it's above cost, you could have paid that out of your pocket and competed. It may have been a losing proposition, but isn't that right? You don't, Your Honor, you don't have to pay a buyer to compete. The point of the antitrust laws is we get to compete on the merits of the product, not that we have to pay a penalty just to have the privilege of competing head-to-head with the monopolist. And the only reason that Mylan couldn't inflict that penalty is because it had a monopoly. That is the use of monopoly power to maintain a monopoly in perpetuity. That is a clear-cut antitrust violation. All right, Counselor, thank you. Thank you. And we'll give you your rebuttal time. I think it'll be important for you to have that full rebuttal. Thank you, Your Honor. Mr. Englert. May it please the Court, my name is Roy Englert, and I represent the Mylan appellees. The centerpiece of Sanofi's economic expert testimony was excluded below under Daubert as unreliable and, more important for today's purposes, as inconsistent with the facts of record. Sanofi has not appealed that exclusion, but you're hearing the same analysis, the same excluded analysis from Mr. Silbert today. At page 72 and 73 of his Daubert opinion, Judge Crabtree held, in a ruling that Sanofi has not appealed, that this theory that you're hearing today is contradicted by the indisputable record of facts. What really happened in this market is not that Mylan somehow leveraged so-called entrenched demand to keep payers from doing business with Sanofi. Sanofi's own CEO openly admitted that until August of 2014, Sanofi resisted competing contracts. That changed, and then Sanofi was doing very well. Did we lose somebody? I'm sorry. I've asked Counsel to reactivate his camera. But he's still in the room. Oh, he can still hear. Let's stop the time, please, Kevin. Yeah. Mr. Silbert, you need to be, you need to stay on video. Understood, Your Honor, I apologize. Thank you. And we'll give you a little extra time too, Mr. Englert. Thank you. Continue. Thank you, Your Honor. Sanofi had all kinds of successes in 2015, achieving, in its own words, 80% commercial access overall. And one reason it had such success was that as every single PBM that addressed the subject testified, PBMs had plenty of ability to shift share away from EpiPen to AlbiQ if AlbiQ made a good enough offer. Sanofi left the market not because of anything Mylan did, but because it was completely recalled for safety purposes, AlbiQ was. There's a reason why every economist who's had anything to say about this case. Let me ask you, are you saying that this whole argument they're making is not good because in, what was it, 85 or whatever year it was that they recalled from the market? Is that what you're saying? Is their sole argument and it's not good here? Is that what your argument is? My argument is that they were not driven from the market by anything my client did. They were driven from the market because of recall. But my larger argument is that this record shows competition on the merits, specifically competition for the contract and specifically competition in the form that the payor is required, filling up big grids, making various offers for exclusivity and so on. And the payors all testified they had plenty of ability to shift share away from EpiPen to AlbiQ if AlbiQ made a good enough offer. There's a reason why every economist who's had anything to say about this case, other than Sanofi's excluded expert, is on Mylan's side. There's no economic amicus brief on Sanofi's side, but there are two on Mylan's side, one of them signed by a Nobel laureate, as well as other leading scholars. This record shows competition, specifically competition for the contract, and penalizing competition in the name of antitrust would be perverse. Antitrust law protects competition, not competitors. Even if this were a close case, which it's not, it would be important to bear in mind that mistaken inferences can be especially costly in antitrust law. And that's most true when the challenge conduct involves cutting prices, as this case does. Erroneous condemnations can shield the very conduct antitrust law is intended to encourage. And it's important for the rules of antitrust law to be clear and judicially administrable so that law-abiding companies can know what is and isn't allowed. Now, exclusive dealing cases are fact-intensive. That doesn't mean there's no form at all of the analysis. Mr. Engler, can I interrupt you. I'm interested in what we do with the fact that it seems that prior to Abiquiu entering the market, there was a pretty unprecedented price escalation of the EpiPen on Mylan's part. And what I understand Sanofi to be arguing is that that your monopoly volume when combined with that unprecedented price escalation puts you in this position of being able to offer these substantial discounts, because you put yourself in that position The price escalation is not the challenge conduct as an antitrust violation here, it's the rebates off of that price. And recall that Sanofi itself Are we allowed to factor it in at all in terms of what happened here? Sure. Essentially they were excluded from more than half of the largest formularies because of those rebates. The record doesn't support that statement, Your Honor. The highest foreclosure they ever claimed below was 31%. Yes, the 50% comes from there. I understood you dispute that, but it comes from the, I forget what it's called, but the effect essentially the Spillover effect? Spillover effect is the additional 20% that they add on to that to get Except that they never quantified that. That's just a guess and guesses don't make out any trust cases. But as Judge Baldock pointed out in one of his questions. This is not a case of below cost pricing. This is a case in which Sanofi says that Mylan raised its price. Then Sanofi came in at an equal or higher price and it claims it was unable to compete, even at that price level, even at that supposedly elevated price level. This doesn't add up. If our prices were especially high, that increased Sanofi's ability to compete. It didn't decrease it. Now, as I was mentioning, the Third Circuit has synthesized many years of precedent and it's two to one decision in favor of a plaintiff in Z.F. Meritor. Judge Crabtree's opinion faithfully marches through the factors listed in that case and explains by every one except market share of favors Mylan. To be specific, the challenge contracts were of short duration and easily terminable and in fact were frequently renegotiated. There's affirmatively invited bids for exclusivity instead of being coerced into it. Making bids for exclusivity is very common practice in this industry and engaged by both parties to this case as well as by the industry as a whole. And even Sanofi's overstated foreclosure percentage is below the threshold usually required for liability and exclusive dealing cases. If there are to be any standards at all to separate lawful from unlawful exclusive dealing, this case falls very comfortably on the lawful side of the line. Sanofi would rather not have any such standards. It complains about what it calls a wooden application of the Z.F. Meritor factors. The Z.F. Meritor is a very strange case for Sanofi to attack. It represents the high watermark of plaintiff friendly rulings in the Third Circuit, provoking a long and emphatic dissent from Judge Greenberg. And it was followed by Ace I.B. Sanofi, in which the Third Circuit had very little trouble affirming summary judgment against any trust claims very similar to those being pursued here and in the same industry. The Third Circuit standards are an appropriate way to assess this case. And under those standards, Sanofi loses. Now, as to the facts, Judge Crabtree's summary judgment opinion systematically marches through each of the seven largest payers and summarizes the record evidence with respect to each, drawing largely on the statement of undisputed material facts, which is how the facts are organized in the district court and summary judgment litigation. Judge Crabtree takes account not only of what was said in negotiation, but also what rebate agreements resulted from those negotiations. Sanofi argues on appeal that his analysis resolved factual disputes, but it did not, or at least it did not resolve any genuine disputes of material fact. To try to show otherwise on appeal, Sanofi simply quotes snippets from negotiating emails and pays absolutely no attention to the actual results of most of the negotiations. It's Sanofi's analysis, not Judge Crabtree, that's incomplete. And let me give a particularly egregious example of Sanofi's approach. Sanofi's very first factual assertion in its reply brief on page two is that ESI candidly told Sanofi that even a 100% rebate would not be enough to grant ABIQ access to the market. But the very next year, ABIQ got access to the market through a deal with ESI, including exclusive position on ESI's high performance formulary. So ESI, which is the largest player with about 40% share of covered lives, is a perfect example of how Sanofi's antitrust theory, like its expert testimony, simply doesn't accord with the record. Was that sustainable, though? Could they have sustained the kind of high discounts they would have had to make to compete? Was that sustainable? It seems to be what their argument is at this point, that yes, they did that, but it was that it was at a loss. No, they absolutely never argued that they were doing it at a loss. The way one argues that one is forced into below cost pricing is to apply some kind of economic test, the discount attribution test or the price cost test. And Sanofi disclaimed every such argument below. But we also we put in unrefuted expert testimony that all the prices in this case passed the price cost test. So they really can't argue that they were losing money. Their argument is just they didn't want to have to compete this hard. But let me focus on ESI because very early in its reply brief, Sanofi says its 30% rebate offer made its offer better than Milan's 23% and that ESI's decision to go with Milan instead of Sanofi therefore proves its theory. What Sanofi doesn't tell you is that the 30% was off a WAC or list price of $379, whereas Milan was taking 23% off the list price of $345. Those numbers can be found at page 9071 of the joint appendix. And all by itself, the difference in list price shows why Milan's per unit price was better than Sanofi's. But that's not all. Milan offered 10% price protection. Sanofi offered none at all. Sanofi's own expert in her written report said that the price protection made Milan's offer equivalent to a 30% discount. So Milan's offer was even more superior to Sanofi's on a per unit basis, having nothing to do with entrenched share or lock in or spill over and not because of, well, on a per unit basis. Judge Crabtree looked systematically at the other six largest payers and we summarize what happened with those payers in a chart on page 19 of our brief. Three of those six payers never excluded IBQ. Two of the six, Optum and Medimpact, did exclude IBQ completely from the national formularies both years 2014 and 2015. But both Optum and Medimpact used the threat of exclusion to play Sanofi and Milan off against each other and force the winning bidder, which did turn out to be Milan, to increase its rebates and give the PBMs better prices to pass on to consumers. That's a success of the competitive process, not a failure. The remaining two payers are ESI and Aetna. As I've already mentioned, ESI did put IBQ on its national formula in 2015 and even made it exclusive on the high performance formulary, shifting share in the very way that IBQ claims is impossible. Aetna did the same thing on its national formulary. So all the noise Sanofi makes about payers who supposedly could not move against EpiPen to cover a competitor are contrary to the end results of the negotiations. Judge Crabtree called Sanofi out at page 94 of his opinion for ignoring the outcomes of rebate negotiations, but Sanofi has doubled down on that tactic on appeal. What's the common theme at all seven of the largest payers? Price competition worked. IBQ got plenty of access to the market in 2015 when it decided to be serious about competing on price, and Milan was forced to cut price that the only two payers were to enjoy exclusivity both years. That is exactly the competition that the Sherman Act encourages for the benefit of consumers. Can you address Judge Crabtree's what I understood was an alternative basis for summary judgment and that's the antitrust injury issue he found there was no antitrust injury. I guess I'm concerned here about how can you say there was no antitrust injury with respect to consumer choice. I think the study showed that that consumers heavily favored the portability and the design of the IBQ, its ease of use, a lot of things about it. And yet, how did this not heavily restrict their ability and their choice between these two. Well, let's go back to a point Judge Breyer made for the First Circuit almost 40 years ago in the very right case that Judge Sutton made for the Ombuds Sixth Circuit in the Nixad case. Every contract, every sale by definition excludes some other product. That can't be the test of liability. The test of liability has to be, was it excluded on the basis of something other than competition on the merits. And the test of liability is not met in this case but also Judge Crabtree was entirely correct to say that Sanofi hasn't shown antitrust injury. As to output, it's undisputed that output rose over the period of alleged antitrust violations. As to price, although price did rise in some years but fell in 2015 right when how he started competing. The rebates can't possibly be what led to that price increase. They can only be what get into that right right into that price increase. And it's the rebates that Sanofi is challenging, not the increases in the whack price. So that's an alternative and independent basis for affirmance and unless the court has other questions I would suggest that the judgment be affirmed. Any other questions from the court. All right. Thank you. Thank you, counsel. Mr. Silbert. Thank you, Your Honor. My friend on the other side says we were excluded because we chose not to compete. Hang on. I wanted to give Mr. Silbert his, what he had originally reserved. Oh, thank you, Your Honor. I'm not sure how much that was, Kevin. Did I give him two and a half minutes? I think so, yeah. Okay. Thank you. Kevin. My friend on the other side says we were excluded because we chose not to compete on price. That's a fact question. The jury should decide. Let's look at what the record actually shows. Here's what happened at MedImpact. We made what was undisputedly a better offer. Clearly we're competing on price.  Mylan comes back and says, if you exclude EpiPen, we will maintain 40 to 70 percent share anyway, and you will have to buy all of those EpiPens at our high list price. To your point, Judge Moritz, yes, Mylan raised the list price by 30 percent. It was not the rebate. It's not the discounted price that matters. It's the price that the payers would have to pay if they don't exclude us, and they don't get the rebate, and they have to buy all of those EpiPens. That's exactly what Mylan used to compel MedImpact to exclude us and not it. Even though we made what was undisputedly a better offer, and they agreed on a price to exclude us, and the same day they came to us and said we're going to exclude AviQ, not EpiPen, we said give us a chance to beat that offer, and they said not interested. We don't care what your price offer is. That is not competition on the merits of the prices. Okay, now my friend pointed to Express Scripts. He said that shows that it was competition on the merits. It shows the exact opposite. Again, Express Scripts came to us and said you cannot get in with a 100 percent discount. It doesn't matter. You could give it to us for free. We don't want it. You have to pay us to take it because Mylan can inflict a bigger penalty on us for allowing you to compete than you could give us just by having the product on the market. My friend says now for the first time that this is not an argument they made in their opposition brief, that their argument in 2013 to ESI was better, Express Scripts, because with their price protection they were at 30 percent, which is where we were. He points you to the list price. Here's what my friend neglected to mention. We were also offering $18 million in Lantis points. So he thinks that their offer was marginally better maybe, depending on how you look at it, but he ignores the $18 million we were willing to give them just for access. Their offer was for exclusion. We were giving them all that plus $18 million just to be able to compete, and the payer said no, we don't want you because if we allow you in, we're going to have to buy all those EpiPens at a very steep price. Look at what happened with Express Scripts in 2015. We offered 60 percent to exclude EpiPen, 60 percent discount, and ESI, the payer, said, well, if we did that, we would lose $1.6 million because we would have to buy all those EpiPens anyway, and no matter what discount you give us, we're going to have to pay the full price or close to the full price on the EpiPens and we lose money. Counsel, you need to close up your time. I'm sorry. That is coercion that only a monopolist can do. This is an antitrust violation, plain and simple. These are fact questions. You should send them to a jury. I have one question. Yes, sir. If the PBM excludes, I guess it's the EAT, does the insurance company pay or does the customer pay? The customer would have to pay full price unless there is a doctor that reverses the exclusion. So, for example, one way that the exclusion works is prior authorization, and what that means is the doctor has to fill out a bunch of paperwork and forms and then the insurance covers it. I got it. That's why I wanted to ask the question. I wasn't sure I was following where you were going. Thank you. You are correct, Your Honor. Thank you, Counsel. Judge Ott, any other questions? No, I'm good. Thank you. Thank you, Your Honor. All right. Well, Counsel, we appreciate your arguments. They've been extremely helpful as well as your briefs, very good, and the case will be submitted and Counsel are excused, and the court will be in recess until 9 o'clock tomorrow morning. Thank you. Thank you. Thank you, Your Honor. Here we go. Okay, we're all alone. Okay, just us? Yep. Okay. All right, guys, how much time? I think I said 15 minutes, but I'm open to whatever time you need at this point. Allison or Bobby, what time do you want to get back together? Allison, what? That's fine with me. So like 5 to 11, my time. Is that all right? That's good for me. Okay, let's plan that. I think we're scheduled to get back on team's video if that's all right with everybody. It seems to work well. Good. Thank you. You got to come find me if I don't get there. We'll find you, Bobby. Don't you worry. Or Allison and I will just get it all done without you. All right. That's okay, too. Give you your wish and assign you all the cases. All right. See you all in a minute. Bye. Thank you. Thanks, Kevin.